## IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **JOHANNA TRAVIS**, | ) | Tipton County Chancery Court |
|  | ) | No. 14,862 |
| Plaintiff/Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9707-CH-00163 |
|  | ) |  |
| **MARTIN L. TRAVIS**, | ) |  |
|  | ) |  |
| Defendant/Appellant. | ) |  |
|  | ) |  |

FILED

July 29, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

_____

From the Chancery Court of Tipton County at Covington.
**Honorable J. Steven Stafford, Chancellor**

**J. Thomas Caldwell**, Ripley, Tennessee
Attorney for Defendant/Appellant.

**Cyburn H. Sullivan**, Covington, Tennessee
**James H. Bradley**, Covington, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

This is a divorce case. The parties, Martin L. Travis (Husband) and Johanna Travis (Wife), married in February 1984, separated in September 1995 and were divorced by final decree entered in June 1997. Three children were born of the marriage: Joshua Daniel, born April 19, 1985, Alexandria Faith, born August 18, 1987, and Nicholas Hunter, born January 3, 1993. Husband has appealed from the final decree, challenging the correctness of the trial court's decision to award sole custody of the children to Wife. He has also raised additional issues relating to the children.

Husband and Wife were childhood sweethearts, having met when they were ages 7 and 6, respectively. They attended high school together and were members of the same church where they participated in various youth related activities. They married at ages 19 and 20. There were problems throughout the marriage. Both parties testified to verbal abuse and physical altercations, sometimes in the children's presence. It was Husband's testimony that the physical abuse was initiated by Wife and that he responded only in self-defense. Wife described Husband as domineering and controlling. Husband testified that for the first seven or eight years, his priorities were somewhat amiss with his attention focused primarily on his work as opposed to his wife and children. After an accident resulting in the loss of his job, however, he stated that he was in a position to spend more time with the children and was consequently made aware of the importance of family and has since shifted his priorities. Husband is in the printing business and at the time of trial was employed as an estimator for a printing firm in Jackson, Mississippi, earning approximately $45,000 annually. Wife was the primary caretaker of the children during the marriage and for a time also operated an in-home day care, caring for up to 25 children.

Neither party has resided in the marital home, located in Covington, since May 1996. Wife testified that she moved to Bartlett after the couple's separation when her day care business began to dwindle and she was caring for only three or four children. At the time of trial, Wife operated an in-home day care from her residence in Bartlett, caring for four children and earning between $300 and $350 per week. She currently dates a Bartlett police officer, Mr. Frank Lemmons.

The testimony was undisputed that much animosity

2

exists between Lemmons and Husband which, the record indicates, has affected the children, most particularly the eldest, Joshua. The trial court conducted an in chambers conference with Joshua who indicated a preference that his custody be awarded to Husband. Husband testified that he would be willing to relocate to Tipton County if so ordered by the court in order to obtain custody of the children. The children have a relationship with both their maternal and paternal grandparents all of whom live in the Covington area, as well as other cousins, aunts and uncles.

The trial court was presented with the deposition testimonies of three clinical psychologists, one who interviewed the children and Wife and recommended that custody be placed with Wife, one who interviewed the children and Husband and recommended that custody be awarded Husband and the final who offered no recommendation to the court but who testified as Joshua's individual therapist regarding the impact of the divorce on him. There was conflicting testimony among the psychological experts as to whether Wife's relationship with Lemmons had negatively impacted the children.

The final decree indicates the parties stipulated that grounds for divorce existed and that both parties were granted a divorce pursuant to statute. As heretofore noted, the trial court awarded custody of the children to Wife, with Husband receiving "standard visitation privileges as previously agreed by the parties." Husband was ordered to pay monthly child support. The decree instructed that Wife was to avoid any contact between Lemmons and Husband regarding the children; that any discussions involving the children's welfare were to be conducted between the parties; and that all discipline of any type to the children was to be administered by the parties only. Finally, the decree ordered the parties to continue Joshua's counseling sessions with Dr. Allen Battle "on an as needed basis until such time as Dr. Battle discharges Joshua or until the court orders otherwise."

In a memorandum opinion, the trial court made the following factual findings as they relate to child custody:

Wife is

3

currently dating a man named Frank Lemmons. . . . She admits that she is having sexual relations with Mr. Lemmons but denies doing anything inappropriate in the presence of the children. The Husband claims that the Wife is attempting to have Mr. Lemmons take his place in the lives of the children. The Wife denies this. The Husband and Mr. Lemmons have

4

had verbal confrontations in the presence of the children.

Frank Lemmons testified on behalf of Wife. He stated that he loved the Wife and he and the Wife had done nothing inappropriate in the presence of the children. He also denied spending the night at the Wife's home while the children were present.

Mr. Lemmons denied that he

5

had done anything to impair the children's relationship with the Husband. He claims to do a lot of things with the children. He also testified that he will always dislike the Husband and does not believe that he will ever be able to resolve that problem.

Upon request of the Husband, the Court interviewed the parties' oldest child, Joshua, in the presence of

6

the parties' attorneys. The Court found Joshua to be a very intelligent child who loved both his parents. He is extremely concerned with this divorce and the adverse affect that it has had on him and his siblings. He also stated that his grades have gone down since the filing of the divorce. Joshua testified that it would be his preference to live with his father.

7

The Wife testified that the parties cannot discuss anything civilly and are unable to agree on any issues. This has resulted in the parties experiencing great difficulty regarding the children since their separation.

Based upon the evidence before it, the court concluded:

The Court is troubled with various aspects of both parties' lives. However, it has no doubt that both parties love

the children and in their own way, seek what they believe to be best for the children.

The Husband has admitted that the Wife is a good mother. However, his concern, as well as the concern of the Court, involves the Wife's relationship with Mr. Lemmons. Additionally, the Court is troubled with the lack of success that Joshua has experienced in his

9

school work since the separation.

On the other hand, the Court is concerned with the control that the Husband seems to want to assert in all issues. The Court is also concerned by the allegations of physical abuse and with the Husband's inexplicable behavior exhibited toward the Wife during various arguments.

The Court

10

does not believe that the children should be separated but that they should remain together. The Court also does not believe that it would be in the children's best interests to move to Jackson, Mississippi.

After entry of the decree, Husband filed a motion for additional findings requesting that the court enter an order allowing him to take two of the children as dependents for income tax purposes and requiring the parties to share travel expenses relating to visitation by instructing that they exchange the children at a convenient location halfway between Jackson, Mississippi and Covington. The trial court subsequently denied Husband's request for a sharing of travel expenses, but ordered that he be allowed to take the youngest child as a dependent for income tax purposes.

Husband presents the following issues on appeal:

I. The Court erred in

11

awarding custody of the parties['] three children to the wife.

II. The Court erred in failing to require the parties to jointly share the children's transportation expenses.

III. The Court erred in failing to allow the Husband two (2) of the children as dependents for income tax purposes.

We first address the issue of child custody. Our primary concern is the best interests of the Travis children. The standard of review is in accordance with Rule 13(d) T.R.A.P. which provides for a *de novo* review accompanied by a presumption of correctness of the trial court's findings of fact, unless the evidence preponderates otherwise. *E.g.,*

*Whitaker v. Whitaker*, 957 S.W.2d 834, 838 (Tenn. App. 1997).

We are guided in our decision by certain guidelines previously established by case law as well as those factors set forth by statute. These aides in making our determination were addressed by the court in *Whitaker* as follows:

> In child custody and visitation cases, the welfare and best interests of a child are the paramount considerations and the rights, desires, and interests of the parents become secondary. *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. App.1987). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App.1983), the

13

Court established some guidelines for making the determination of best interest:

We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. App.1972).

14

There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:

Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed

15

perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

*Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn. App.1973) (emphasis supplied).

*Bah*, 668 S.W.2d at 666.

The trial court must also consider the

16

factors as set forth in T.C.A. § 36-6-106 (1996):

**36-6-106. Child custody. --** In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors

17

including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3) The importance of continu

18

ity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may

19

hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(9) The character and behavior of any other person who resides in or frequents the

20

                                        h o m e
                                        o f   a
                                        parent
                                        a   n   d
                                        s u c h
                                        person'
                                        s
                                        interact
                                        i o n s
                                        w i t h
                                        t   h   e
                                        child.

*Whitaker*, 957 S.W.2d at 837-38.

As heretofore noted, the record before us indicates that the two oldest Travis children, Alexandria and Joshua, ages 9 and 12 respectively, at the time of trial, were both interviewed by clinical psychologists regarding the impact their parents' divorce has had on them. From the psychological reports, as well as the testimonies of the parties, we conclude that Alexandria is coping sufficiently with her parents' estrangement, due in some degree to the fact that her older brother serves as sort of a "buffer" between her and the family situation. Dr. Battle testified that Alexandria is "doing quite well" and is not exhibiting any psychological problems other than those normally expected of any child whose parents are in the throes of a divorce. Nor does the record reflect any unusual or significant adjustment problems for the youngest child, although he was not interviewed psychologically due to his age. The record, however, does suggest that Joshua has been severely impacted by the divorce and has endured much emotional turmoil as a result. There was testimony in the record that Mother's employment in the Covington area, running a children's day-care, was no longer feasible after the parties' separation because children were taken out of the day care. However, instead of seeking employment in the area in which the children had grown up and the area in which their extended family was located, Mother moved the children to the Bartlett area, near Mr. Lemons, and remained unemployed for a significant period of time. There is nothing in the record indicating that this move was in the best interest of the children; indeed, the record indicates that the move created more turmoil for children already caught between two parents in conflict. The record also indicates that Mr. Lemmons disciplined the children by "whipping" them. On the other hand, Dr. Stacey L. Dixon testified that Alexandria divulged to her that her father

21

"doesn't give me my asthma medicine" and "when I cough it drives him crazy and he slaps me on my face." She also told Dr. Dixon that her father does not take her to the doctor when she is sick when she is with him. We do not find the evidence to preponderate against the trial court's grant of custody of Alexandria and Nicholas to mother.

Dr. Battle, Joshua's therapist, testified that Joshua exhibited "extreme concern about the anger that exists between mother and father. . . . anxiety and sadness that is evoked by the disruption of his home and his family. . . . grave concern about his mother having an affair with another man. . . . [and] the desire to live with his father while at the same time he feels frustrated in doing so and fearful that he won't [be] able too." Dr. Battle continued:

> In Joshua I just see him in essence in a state of transition. In other words, he has not solidified into anything. It is simply sort of psychological upheaval, as though one had a container of water in which the dirt has settled

out of the bottom so you have clear water at the top and dirt at the bottom, and someone comes in with a stick and stirs the whole thing up and then everything is just topsy-turvy, but there is no resolution in Joshua's mind at this point except insofar as he decided as of the last time I saw him and even indeed before then that he would rather live with his

23

father because that would be more in keeping with the goals and the values that he has been taught.

Dr. Battle believed Joshua had been "psychologically disturbed," but believed any damage done could be healed with further therapy. He believed Alexandria had faired better during this family trauma due to her age and the fact that Joshua, her older brother, had created a certain degree of security for her. Dr. Battle did not find Joshua to exhibit any "deep psychopathology" and believed his disorder environmentally produced. He concluded that Joshua had "sufficient intelligence, grasp of the situation and of himself to be eminently capable to make an informed decision. And I find that his reasons for living with his father are not silly, trivial, childish reasons that might be given by a child for the benefit of their own gratification . . . ." When questioned as to the effect on Joshua if custody was divided and he was raised apart from his two siblings, Battle responded, "[o]ne does not like to have that division of siblings under conditions where everything else is equal." Battle said this was particularly the case if the children were to be raised hundreds of miles apart.

During the in chambers conference, Joshua informed the court that he did not like the school that he transferred to in Bartlett as well as the one he attended in Covington and that he didn't "know if it's just because of this divorce, I've been making Fs, and its not great." When asked whether he looked out for his little brother and sister, he replied "I keep them in the corner of my eye all the time." He stated that if he "had a choice," he would "probably want [he and his siblings] to live with [his] dad. . . . I would just like that better, I would think." When asked if there was "[a]ny particular reason" for his choice, Joshua explained that "some of it is Frank." He stated, "every time my dad drops us off, [at his mother's, after visiting], [Frank's] got

24

to carry on something." Joshua said that Frank was always calling his dad bad names. He related an incident where Husband had returned the children to Wife's house after visiting. Lemmons was present and "started calling [his] dad names." He continued, "[m]y sister threw down her shoes and jumped in my dad's arms, and my brother was clinging onto his legs until my mom came out there, and she told my dad to let go. . . . My sister wouldn't let go. It was just hard." Joshua said he sometimes worried about his mother and father and was "always" concerned about his brother and sister and felt as though he had to take care of them. Joshua said that Lemmons disciplined him and his siblings by spanking them. He preferred it when Lemmons was not present at his mom's home.

We recognize that divided custody arrangements generally do not serve the best interests of the children and that, if at all possible, decisions regarding custody should be made so as to avoid this particular result for children who deserve no less than other children whose parents remain united. As stated in W. Walton Garrett, *Tennessee Divorce, Alimony and Child Custody* § 24-15 (1997), "[t]here is a strong presumption that the welfare of the children will be best served by keeping the children together." This presumption, however, is to be "viewed in light of the particular facts and circumstances surrounding each child custody case." *Hollis v. Hollis*, No. 01A01-9704-CH-00178, 1998 WL 57537 (Tenn. App. Feb. 13, 1998).

We are cognizant of the fact that Joshua's preference is not binding, but is one of the factors to be considered in a custody determination. *Smith v. Smith*, No. 01A01-9511-CH-00536, 1996 WL 526921 (Tenn. App. Sept. 18, 1996); *Hardin v. Hardin*, No. 03A01-9711-GS-00507, (Tenn. App. May 19, 1998). Given the relationship between Joshua and Mr. Lemmons and between Joshua and his father, we find it to be a particularly significant factor in this case. Having reviewed this record, we find that there is strong evidence in favor of Father being awarded custody of Joshua. However, our careful review of the chancellor's discussion with Joshua convinces us that Joshua's expressed preference to live with his father was based on Joshua's assumption that custody of all the children would be awarded to father. As previously discussed, the children are very close and Joshua feels protective toward his younger siblings. We do not believe he envisioned them being separated. Therefore, we conclude that this case should be remanded to allow Joshua to express to the trial court whether his preference would be the same if he and his

25

siblings are separated. The record before us does not contain evidence of the effect of split custody on the children and whether or not it would be in their best interest. Therefore, we are of the opinion that this case be remanded to the trial court to conduct a further hearing on the issue of custody pursuant to T.C.A. § 27-3-128 and to consider all factors concerning custody of these children. The trial court shall also make any further determinations concerning child support, visitation and the allocation of tax deductions as the circumstances require.

We commend the trial court for including in the final decree that Wife is to avoid any contact between Mr. Frank Lemmons and Husband regarding the children and that all discipline of any type to the children be administered only by Husband or Wife.

In view of our remand, the second issue presented by Husband is pretermitted. Costs of this appeal are taxed to Mr. Travis.

_____

FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
LILLARD, J. (Concurs)